LEIGH M. CLARK, Retired Circuit Judge.
This case has been replete with anachronisms throughout its course in the trial court and on appeal. A jury found this appellant guilty under an indictment returned on October 8, 1982, charging that defendant “did unlawfully own, possess, keep or train a dog or dogs with the intent that such dog or dogs be engaged in an exhibition of fighting with another dog, in violation of Section 3-1-29 of the Code of Alabama, 1975, as amended, _” According to 1983 Cumulative Supplement of Code of Alabama 1975, the cited section of Title 3, on the subject of ANIMALS, § 3-1-29, the particular Code section constituted a codification of Acts 1982, No. 82-461 p. 739, effective May f 1982, which provides, inter alia, “(a) It shall be a Class C felony for any person: (1) to own, possess, keep or train any dog with the intent that such dog shall be engaged in an exhibition fighting with another dog.” The indictment contained no allegation to the effect that the crime was committed subsequent to the beginning of the effective date of the creation of the statutory offense.
According to the evidence for the State that consisted of the testimony of three witnesses, a deputy sheriff, and two officials of the Birmingham Humane Society, the investigation of the offense charged was commenced by the deputy sheriff, while acting as an undercover animal cruelty officer on April 30, 1982. According to his testimony, he observed pit bull dogs on chains behind the house where appellant lived; the witness determined from the appearance of the dogs that there had been cruelty to them, which fact is confirmed by other evidence in the case, particularly pictures of some of the dogs and expert testimony on the part of two officials or employees of the Birmingham Humane Society. The witness testified extensively as to the conduct of defendant in showing the witness his dogs, guiding him about the premises and to a structure about three or four blocks from defendant’s residence, which defendant said he had built for presenting and exhibiting dog fights that he had conducted there. Toward the end of the testimony of the deputy sheriff on direct examination, we find:
“Q. If you can remember, to the best of your recollection, what did the defendant say to you and you say to him after you got back to his house?
“A. Just general dog fighting talk. One thing stood out in particular.
“Q. And what was that, please, sir?
“A. He was drinking a beer, he had a beer in his left hand and he made the statement, ‘ — excuse me, ladies — ’ there is three things I’m going to do, drink this beer, [the vulgar four-letter verb is here omitted] these women and fight these dogs.’
“Q. And after he made that statement, what if anything did you do?
“A. We left about that time. Said our goodbyes and left.
*773 “Q. On May the 10th, did you have an opportunity to obtain a search warrant for the premises there at 4229 School Street in Adamsville?
“A. Was it the 9th or 10th?
“Q. Well—
“A. Well, yes, sir, I did.
“Q. Now, when did you execute the search warrant?
“A. On the 10th or 11th. Hold on. On the 11th, May the 11th at 9:20 in the morning.

“Q. Well, when you went to the School Street?
“A. All right, sir. We went to School Street and still had the same dogs on the same chains, so we confiscated the dogs. Served the search warrant first and then confiscated the dogs.
“Q. Was Mr. Williams present?
“A. At first he was not. I think his brother went after him. He got there approximately fifteen minutes after I did.”
The record shows that the prosecution for “violation of the act to prohibit dog fighting” commenced by warrant of arrest issued on May 12,1982, that defendant was committed to jail on that date, and that on May 24, 1982, the District Court entered an order binding defendant over “to await the action of the grand jury.”
The undisputed evidence, including the testimony of defendant, shows that defendant, about 28 years of age, lived in the house with his mother and owned at least eight pit bull dogs, which he kept in the yard of the house where he and his mother lived in Adamsville. He was a known dog fighter, who had bought and sold dogs and engaged in dog fights for a long time. He testified that he knew about the new anti-dog fight law and that he had not engaged in dog fights or allowed any of his dogs to engage in dog fights from the time the law went into effect. In addition to the pit bull dogs, defendant owned some beagles. He testified:
“Q. Now those pit bull dogs. How did you acquire those dogs?
“A. I acquired them as, you know, pets, but I was using them, you know, some times for fighting.

“Q. When did you get those dogs; do you recall?
“A. I had them about, I imagine, a year and a half, two years, somewhere along there.”
About the time of the institution of the prosecution of the case, the pit bull dogs were confiscated by the State and placed in the Birmingham Humane Society until after euthanasia of them in accordance with an order in a proceeding brought in equity in the Jefferson County Circuit Court.
At the sentencing hearing, the court sentenced defendant to imprisonment for two years and placed him on probation for the same length of time. In addition, the court ordered that defendant make restitution of $3,000.00 to the Humane Society or “Humane Shelter,” as it is named in the record, which apparently represented almost half of the charges for keeping the dogs.
The element of time has been a complicating factor in this case, not only on the trial thereof, and in the intervening stage between the judgment of conviction and the filing in this Court of the record proper and the transcript of the proceedings, but also in what has occurred or has failed to occur within the proper time in this Court. Some light is shed upon the reasons for such complications by the following portion of the transcript at or near the conclusion of the sentencing hearing:
“MR. MASSEY [Defendant’s attorney]: Your Honor, I am not expressing an opinion on his ability to repay the Humane Society restitution, I expressed that earlier today. I am talking about his indigency status.
“THE COURT: No dice. Now, another sheet of paper with appeal on it.
“Mr. Williams, the bill was 6100 dollars, I have cut it in half, to remove any question in my mind that the bill might have been reasonable, okay....
“All right. Notice of appeal; right?
*774 “MR. MASSEY: Right. And I think, Your Honor, we need it on the record for purposes of appeal that Your Honor knowing Mr. Williams does not work, nevertheless, denied indigency status.
“THE COURT: Well, I know he has an income, I have been told that he sells drugs. I don’t know that I can prove that. I can’t prove it.
“MR. MASSEY: I don’t think the Probation report even reflects that, Your Hon- or.

“THE COURT: What is your source of income?
“MR. WILLIAMS: Income?
“THE COURT: Yes.
“MR. WILLIAMS: Where I was working at?
“THE COURT: How did you pay this lawyer?
“MR. WILLIAMS: Help from my brothers and such.
“THE COURT: How much is your bill, Herb, if you want to say, and how much has he paid?
“MR. MASSEY: Your Honor, I don’t know how much he has paid, but I would say that it is probably less than one-third of what the total bill is. And the bill should have been probably double what it was primarily based on the fact we had a proceeding at the time when Mr. Williams first came into our office that we were not aware of in Circuit Court in Equity, brought by the Humane Society to destroy the dogs, which was subsequently compromised. But, it was compromised after the hearing, briefs and arguments.
“THE COURT: Well, how much was your bill?
“MR. MASSEY: I believe it was ten thousand dollars.
“THE COURT: So, he has paid you over twenty-five hundred dollars?
“MR. MASSEY: I don’t believe so, I believe he has paid me considerably less than that.

“MR. WILLIAMS: I guess ten or eleven.
“THE COURT: Eleven hundred dollars?
“MR. WILLIAMS: About somewhere like that.
“THE COURT: Approximately. Now you have an account payable with this lawyer, do you not, for the balance? You owe him eighty-nine hundred dollars?
“MR. WILLIAMS: I will owe him.
“THE COURT: Is that right? The bill was ten thousand; right?
“MR. WILLIAMS: Yes.

“THE COURT: Another piece of paper, marked. Well, that is all right. I will just stop there. Anything else? Herb, I like to take care of my lawyers, I just can’t accommodate you this time, my friend.
“MR. MASSEY: Your Honor, I am not asking you to accommodate me, I am not asking that I be appointed as counsel. I am asking that Mr. Williams be afforded the opportunity to appeal this thing.
“THE COURT: I have noted that he has appealed. Get out there in the great American capitalistic way of life and pay for it. He owes you eighty-nine hundred dollars, he has paid you eleven hundred dollars. He is going to pay the court costs, he is going to pay the Humane Shelter. He may have to change his mode of living, I hope he does. Talk to this man, Kitt, or somebody. He is on probation. If I could get Mr. Williams to work, it would have been a good day. Talk to our bailiff, Mr. Williams, and be sure you go by Probation today. Thank you.
“MR. WILLIAMS: Yes, sir.
“END OF PROCEEDINGS”
During the sentencing hearing, there were matters considered by the trial court in addition to those referred to in the above-quoted extracts from the transcript, including defendant’s “MOTION FOR NEW TRIAL, TO SET ASIDE VERDICT AND ALTERNATIVELY FOR DIRECTED VERDICT OF ACQUITTAL,” which *775 will hereinafter be considered in dealing with one or more of the issues presented on appeal.
On April 25,1984, the Clerk of this Court addressed a letter to both of the lawyers representing the defendant on the trial of the case advising them that the Court had instructed her to notify them “that the appellant’s brief in this case was due to be filed on or before April 13, 1984, but has not been filed to date,” and that pursuant to Rule 45B, A.R.A.P., this Court would consider only questions or issues presented in briefs. The Clerk properly and courteously also advised them in the letter of the holding by the U.S. Eleventh Circuit Court of Appeals in the case of Mylar v. State, 671 F.2d 1299 (1982), to the effect that “the failure to file a brief in any non-frivolous appeal falls below the standards of competence expected and required of counsel in criminal cases and therefore constitutes ineffective assistance.” By letter of May 1, 1984, Mr. Massey wrote the Clerk, advising her that he was “the only attorney of record in the captioned matter, that Tom Larkin does not represent Mr. Williams on Appeal.” Mr. Massey further stated in his letter that, “date on which to file Brief slipped because of problems with filing a Brief and requested 10 additional days in which to file a brief.” The letter was not received by the Clerk’s office until May 4, 1984. On that date the Clerk wrote Mr. Massey as follows:
“Please be advised that the above-styled appeal was submitted to the Court on brief of appellee on May 3, 1984. The Court has instructed this office to notify you that brief of appellant will be considered by this Court when and if filed.”
Appellee’s brief on May 3, 1984, contained the following:
“Defendant has not filed a brief in this case. On April 25, 1984, this Court informed counsel for the Defendant of their failure to file a brief. Since neither party has raised any issues on appeal, this Court should affirm the defendant’s conviction. Rule 45(b) A.R.A.P.”
In due course, the record on appeal was delivered by a Judge of this Court to the undersigned for his study, which resulted in a conclusion by the undersigned that he should prepare a memorandum to this Court recommending that, as no brief from appellant had been filed, the judgment of the trial court should be affirmed without an opinion. Prior to the completion of such memorandum, the writer was informed that on June 26, 1984, appellant’s attorney had filed a brief and argument on behalf of appellant; on July 5, 1984, appellee filed a “motion that appellee be granted” a twenty-one (21) day enlargement of time for appellee “to file a brief on the merits,” which motion was granted by a Judge of this Court. Within the time requested, on July 27, 1984, appellee filed its brief and argument, and since that date the writer, at such times as the opportunity was presented, has been in the process of study of the issues now before this Court, which are three in number and which we now proceed to discuss.
I.
By this issue, appellant contends that “§ 1-29 [§ 3-1-29], Code of Alabama is unconstitutional.” Appellee presents its response in two parts. In the first part, it argues that the constitutionality of § 3-1-29 “was not sufficiently preserved for appellate review;” in the second part, it argues that the statute “is not unconstitutionally vague.” Our conclusion is that Code of Alabama, 1975, § 3-1-29 is not subject to any challenge made by appellant-defendant on appeal or on the trial as to constitutionality. This makes it unnecessary for us to decide whether the question of its constitutionality was “sufficiently preserved for appellate review.”
II.
By this issue, appellant says that “§ 3-1-29, Code of Alabama, is Unconstitutional As Applied To Edward Williams.” Appel-lee’s response consists of an outright denial of this contention of appellant, by the statement of appellee that “the statute was not unconstitutionally applied to the appellant.” *776 Appellee’s complete argument on the point is as follows:
“The Appellee’s contention on this issue is that the Appellant was prosecuted for his actions after the effective date of the statute and not before. The crime denounced by § 3-1-29 is capable of being committed over an extended period of time. It is a continuing crime as long as the dogs are kept with the intent to fight them. On May 10 or 11, several days after the statute went into effect, a search was executed and at that time, the officers observed the violation of the statute for which the appellant was prosecuted. Under the Appellee’s view of the facts, the Appellant violated the statute from its effective date, May 4, until he was arrested on or about May 11. Under this view of facts, there was no violation of the ex post facto clause of the Constitution. The Appellant had ample opportunity to desist in his conduct after the effective date had he desired to. Since he did not, he was properly convicted of the crime.”
If the only question for us to decide as to this contention were whether a jury issue was presented as to defendant’s guilt of the alleged violation of the then recently enacted statute, we would be inclined to agree with the position taken by appellee as above quoted. However, the transcript shows an additional pertinent question, in that defendant filed within the time required, a motion for a new trial, which was brought to the attention of the trial judge, who ordered it set for a hearing on May 13, 1983, on the same date of the sentencing hearing, in which motion there was a ground that the “verdict of guilty was against the weight and sufficiency of the evidence.” At the commencement of the sentencing hearing, we find the following:
“THE COURT: Mr. Boudreaux [Assistant District Attorney], what do you have to say about this matter?
“MR. BOUDREAUX: Well—
“MR. MASSEY: Your Honor, we would like to make a motion for a new trial—
“THE COURT: I am not going to grant a new trial. If you want to go through a hearing, you can, but I’m not going to grant one.
“MR. MASSEY: I think I have to, Your Honor, because of the Court of Appeals has said that once the matter is brought to the trial court’s attention—
“THE COURT: Well, it is right here and it is denied.”
Our review of the evidence convinces us that the verdict of the jury was contrary to the weight of the evidence as to the crucial issue of whether after midnight of May 3-4, 1982, the defendant was guilty under the indictment charging that he “did unlawfully own, possess, keep or train a dog or dogs with the intent that such dog or dogs be engaged in an exhibition of fighting with another dog,” and that the trial court should have granted defendant’s motion for a new trial. Perhaps if the defendant had not taken the stand and subjected himself to extensive and intensive cross-examination on the subject, we would not so determine. He disclosed in his testimony his detestable misconduct on his part prior to May 4, 1982, and the possibility of a disposition on his part thereafter, but there was little evidence to show that between the effective date of the Act under consideration and the commencement of the prosecution against defendant he had the intent that any of his dogs “be engaged in an exhibition of fighting with another dog.” In his testimony, he did not attempt to discount the fact that prior to May 4, 1982, his conduct was such that it would have constituted a flagrant violation of the law under consideration if the law had been effective during any of such time.
The'judgment of the trial court should be reversed by reason of the denial of defendant’s motion for a new trial. A judgment should not be rendered at this time in favor of defendant, as requested in the brief of appellant’s attorney. The cause should be remanded to the trial court for another trial.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, *777 serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
All the Judges concur, except BOWEN, P.J., who dissents.